Argued March 30, reversed April 18, 1916.

## FELLMAN *v.* FELLMAN.

(156 Pac. 792.)

**Trusts—Creation—Absolute Conveyance—Parol Trust—Time of Creation.**

1. A parol trust can be imposed upon land conveyed by deed absolute on its face only contemporaneously with the execution of the conveyance.

**Trusts—Parol Trust—Declaration by Grantor—Sufficiency of Evidence.**

2. In suit to establish a parol trust in land, evidence *held* to show that no trust was declared when defendant's grantor executed the deed, absolute on its face, and also that none was in contemplation at such time.

[As to parol trusts in real property, see note in 115 Am. St. Rep. 774.]

From Clatsop: JAMES A. EAKIN, Judge.

Department 2.    Statement by MR. JUSTICE EAKIN.

This is a suit by Frank Fellman against Joseph Fellman. The facts are that on May 26, 1904, Michael Meyer was the owner in fee simple of certain real property in the City of Astoria and on that day he conveyed the same to his nephew Joseph Fellman, reserving in himself a life estate. Excepting this reservation, the conveyance was absolute upon its face. On May 15, 1912, Meyer died, and on August 24, 1914, plaintiff, who is a brother of the defendant, began this suit wherein he claims that the conveyance was coupled with an express trust to the effect that defendant should convey to plaintiff an undivided half interest in the property upon the death of the grantor, and that plaintiff should at that time repay to defendant one half of all moneys expended by him in supporting and caring for the grantor and in caring for the property. From a decree in favor of plaintiff this appeal is taken.

REVERSED.

For appellant there was a brief over the name of *Messrs. Williams. & Bean,* with an oral argument by *Mr. John M. Williams.*

For respondent there was a brief over the names of *Messrs. Anderson & Erickson* and *Messrs. Harris & Hesse,* with an oral argument by *Mr. J. O. Erickson.*

Mr. Justice Benson delivered the opinion of the court.

There is little or no controversy as to the law applicable herein, and all of the questions submitted are to be answered by a consideration of the evidence and its legal effect. It appears from the testimony that Meyer was an old man in poor health and a patient in a hospital at Eugene when the deed was executed. The only persons present when the conveyance was signed and acknowledged were L. E. Bean, an attorney and notary public of Eugene, who was Meyer's legal adviser, and a Mr. Goldsmith. The latter was not called as a witness, and Mr. Bean's testimony is all the evidence we have as to what occurred at that time. His statement of the facts is as follows:

"Q. You may state just what took place there at that time between you and Mr. Meyer with reference to the making of this deed.

"A. Well now, if I remember—my recollection serves me correctly—in the forenoon of that day Mr. Meyer sent for me and discussed the question of the disposition of the property, and in the afternoon following, in the meantime, I prepared the deed, and also a will, and returned to the hospital in the afternoon when it was executed. In the forenoon, when I went to the hospital, Mr. Meyer wanted to know how he could transfer or dispose of his property by giving it to Joe Fellman so that it could not be interfered. with after his death. I advised him, as I remember,

to make a will and devise and bequeath his property. I remember further that he wanted to reserve a life estate, or he wanted to reserve the rents and profits of the Astoria property for his lifetime—and I advised him to make a will, and in that way devise the property to Joe, which would take effect at his death. And he objected somewhat to a will; he wanted to know that if it could not be made even stronger than a will. He had it in his mind that no will could be drawn that could not be broken after the decease of the party or the death of the party making it, when he would not be here. I remember discussing that, he would not be here to defend it and they could break it; and one of his reasons for that was this, as I remember it. He had had litigation and trouble with a wife; he had been married and was divorced, and he had some trouble and considerable litigation, if I gathered it correctly from his conversation, over that divorce; and he was afraid that after his death that possibly his wife would come in and break the will. And then he discussed the question of his relatives. He had a sister in the old country, in Switzerland, I think, a brother, and he didn't—and then there was Joe Fellman here, and Frank Fellman, the two nephews. Joe had been working for him, he said, down at Florence for years, looking after the business down there, and he wanted to put this property all into Joe absolutely, so that it could not be interfered with in any way in the court after his death. That was the substance of it, and after going over it fully, why, then, I suggested that, in view of that fact, in addition to the will, that he make a deed of conveyance for the Astoria property, which was then the only property that he had left, and reserve a life estate in the deed. * *

"Q. Now, was anything said by Mr. Meyer to you in regard to Frank during your conversation with him and the preparation for drawing—

"A. Incidentally, yes. He spoke and discussed Joe and Frank. He said that Frank had not done anything for him; he had come to Astoria and only stayed here a short time and went to California. He had tried to get the boy established in business, but he

didn't seem to want to do it, and along that general line; that he had never done anything for him, and that Joe had been the only one that had helped him; Joe had been faithful to him and had preserved what he had down at Florence by staying there and taking care of it, and he wanted Joe to have it. That after his death, if Joe saw fit to divide it, to give part of it to Frank, or part of it to his own brother who was then in the old country; he would leave that to Joe.

"Q. Now, this deed was executed that day, was it?

"A. Executed on that day.

"Q. Who was present at the time?

"A. Julius Goldsmith and myself and Michael Meyer.

"Q. Was Joe there during any of these negotiations?

"A. Joe was not there at all during any of these negotiations, the day the deed was executed.

"Q. Well, what was done with the deed when Mr. Meyer had signed it and it was witnessed and acknowledged?

"A. Mr. Meyer instructed me to deposit the will and take care of the will in my safe, or in my custody, and to deliver the deed to Joe Fellman. I delivered the deed to Joe, I think, on that same day. I deposited the will in my safe, in my office, and after the death of Michael Meyer, I sent it to the clerk. I sent it to the county judge of this county, under a certain provision of the statute, for record or safekeeping. * *

"Q. Now, if he said—what did he say after these instruments were executed about any division with Frank, if he said anything?

"A. Well, at different times he said that if—whatever was left when he was gone if Joe saw fit to give Frank some of it, why it was all right. He knew that Joe would do what was right with Frank.

"Q. Now, did he say anything about that before the instruments were executed?

"A. Yes, there was some, I think, at the time he was discussing, when he wanted these instruments drawn.

He said something about Frank, and about Joe's mother, and a brother he had in the old country.

"Q. Was there any direction at that time to Joe to give Frank any of it?

"A. Not to my knowledge.

"Q. Well, now, state just what he did say about it, so the court can get his exact language as near as you can remember.

"A. Well, the substance of what he said was this, that he wanted the property to go to Joe and to be vested in Joe in such a way that it could not be upset in the courts. He seemed to have a horror of courts, and that is why the will was drawn in addition to the deed—or the deed in addition to the will.

"Q. Then, if I understand you, there was no direction of any trust in the deed, or anything else?

"A. Absolutely, no; the very contrary to the declaration of any trust. It was vested, to be vested and was vested, fully and wholly in Joe; that was his intention; that was the intention of the instrument.

"Q. Now, in delivering the deed to Joe, did he give you any instructions?

"A. None whatever; only to deliver the deed to Joe and to take the custody of the will until such time as until his death."

The will referred to in Mr. Bean's testimony is also in evidence, wherein the testator bequeaths everything to defendant. Joseph Fellman testifies that his first knowledge of the deed was received when Bean delivered it to him; that Meyer never suggested that he should divide the property with Frank until a year or two after the conveyance had been delivered, and that he then said that Frank was not entitled to anything because he had not done anything for Meyer, but that if defendant wanted to give Frank anything he might, adding, "but you don't have to."

Plaintiff relies upon a letter written by defendant after the death of the uncle which reads thus:

"Eugene, Oregon, June 10, 1912.

"Dear Brother,

"Mr. Meyer was in Astoria when he died. He had been in the hospital for the last four or five years with the exception of a few days before he died. I had placed him in a private house.

"You will remember that some eight years ago the firm of Meyer and Kyle was dissolved and at that time it looked as if Meyer would lose about all he had including the Astoria property. He was ill at the time of the firm's dissolution and deeded all his property to me with the understanding I was to care for him for the balance of his days. There was however, a verbal understanding between us that you were to receive at his death, one half of the Astoria property, providing that you would be willing to help carry the burden of caring for him as well as paying your share of the taxes, street improvements, etc.

"I have been trying to sell the property but without result and the only thing I can suggest to make it pay expenses is to put up a building that would bring some revenue. I am now working on the deal. The plans are out and on my next trip to Astoria I will probably let the contract.

"Will be glad to hear from you and get your views on the matter.          Very truly,

"[Signed]   Jos. FELLMAN."

This letter is sought to be corroborated by the testimony of Charles H. Rohr, who recites that Meyer frequently told him that he intended to leave all his property to "the boys" meaning Joseph and Frank Fellman, and that after the deed was executed he heard a conversation between Meyer and defendant in which the former said, "Now, Joe, you understand that you got to give Frank half of all you get from me," and Joe replied, "Of course." There is also another letter from defendant to plaintiff dated May 31, 1912, in which occurs this sentence, "Although there is no estate left you, you are to a certain extent interested."

1, 2. It requires no citation of authorities to establish the doctrine that the creation of such a trust must be contemporaneous with the execution of the conveyance for, as is said in 1 Perry on Trusts (5 ed.), Section 77:

"The declarations of the grantor, to create a trust, must be prior to, or contemporaneous with, the conveyance, for it would be against reason and the rules of evidence to allow a man who has parted with all interest in an estate to charge it with any trust or incumbrance after such conveyance."

It is perfectly clear from the testimony of Mr. Bean that no trust was declared at the time of the execution of the deed, and that at that time none was contemplated. The evidence of the plaintiff is nowhere inconsistent with this conclusion, and if afterward the grantor's heart softened toward the plaintiff and he urged defendant to divide with his brother, that would create a moral obligation, but none which a court could enforce. It follows that the decree must be reversed and one entered here in favor of defendant, and it is so ordered.                                    REVERSED.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE BEAN and MR. JUSTICE MCBRIDE concur.